IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EVER-SEAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:22-cv-00082 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| STEPHEN BRADLEY HALFERTY d/b/a DURASEAL, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a Motion for Temporary Restraining Order ("Motion") by Plaintiff Ever-Seal, Inc. ("Ever-Seal"). (Doc. No. 6). Counsel for Plaintiff has "certified that that its office emailed a copy of the complaint, summons, motion for TRO and preliminary injunction, and related filings to Defendant Brad Halferty, after filing all documents with the Court." (Doc. No. 11 at 1). Elsewhere, Plaintiff's counsel describes far more fulsome efforts to provide (the sole) Defendant, Stephen Bradley Halferty, with the Motion (and other filings in this case), "certif[ying] that Plaintiff has taken efforts to serve this Motion, Memorandum of Law, and all supporting documents, on Defendant by several different means, including via electronic mail at Defendant's last known e-mail address, via U.S. mail at Defendant's last known home address, and via special process server at Defendant's last known home address." (Doc. No. 6 at 2).

Defendant has not replied to the Motion, and the Court certainly cannot say for certain that he has received actual notice. Nevertheless, as set forth below, the Court concludes that resolving the Motion at this time on an *ex parte* basis is warranted and that Plaintiff has met the requirements

not only for the issuance of a temporary restraining order (TRO), but for the issuance of such TRO even without notice to Defendant.

## BACKGROUND[1]

Ever-Seal is a Tennessee corporation that "provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States" using a "one-time sealant solution called 'Seal-It.'" (Doc. No. 1 at ¶¶ 7–8, 15). Only five companies in the United States are authorized to offer and install Seal-It. (*Id.* at ¶ 16).

Defendant was employed by Ever-Seal from approximately May 2020 to November 2021. (*Id.* at ¶¶ 10, 19). Defendant was initially hired as an estimator for Ever-Seal—a position that involved "attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork." (*Id.* at ¶ 20). Ever-Seal promoted Defendant to the position of sales manager in 2020, when Defendant became responsible for "assisting sales representatives in each Ever-Seal market area at the direction of Ever-Seal management and per Ever-Seal standards, in addition to overseeing his assigned territory in Raleigh, North Carolina." (*Id.* at ¶¶ 25–26). As sales manager, Defendant "learned Ever-Seal's larger marketing and growth plans and

---

[1] For purposes of ruling on a TRO, the Court typically takes as true facts that fit into the following categories: facts "(1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at *1 n. 1 (M.D. Tenn. Nov. 15, 2019). The facts stated herein are taken from Plaintiff's Complaint (Doc. No. 1), which has been verified by Steve Nelson, CEO of Ever-Seal. (Doc. No. 1 at 19). Plaintiff has additionally supported its factual allegations with the Declaration of Tim Lucero, former estimator for Ever-Seal. (Doc. No. 6-1). The Court thus accepts the facts set forth in this section as true for purposes of ruling on the Motion.

strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price." (*Id*. at ¶ 28).

In both roles, Defendant communicated directly with prospective customers on behalf of Ever-Seal and was privy to confidential information including: "EverSeal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary truck design and functionality." (*Id*. at ¶¶ 29-30, 36).

In conjunction with beginning his employment with Ever-Clear, Defendant signed a Confidentiality Agreement that included a non-competition (non-compete) clause prohibiting Defendant from competing against Ever-Seal for two years following his termination from the company. (*Id.* at ¶¶ 31–32; *see also* Confidentiality Agreement (Doc. No. 1-1)). This clause states:

> [E]mployees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter

(Doc. No. 1-1 at 1). The Confidentiality Agreement additionally restricts Defendant from disclosing and/or disseminating certain Confidential Information and Materials[2] for a two-year

---

[2] The Confidentiality Agreement defines Confidential Information as:

period following termination from the company. (*Id*.). Specifically, the Confidentiality Agreement states:

> Each party acknowledges it is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with the Transaction and that the Confidential Information and Materials are and will be of a secret, proprietary and confidential nature. Each party further acknowledges that, except as otherwise provided herein, during the term of the Transaction and for a period of two years thereafter, it will never, directly or indirectly, use, disseminate, disclose or other wise divulge any Confidential Information or Confidential Material. Further, each party shall prevent any unauthorized disclosure of Confidential Information or Materials by its employees, agents or independent contractors.
>
> [. . .]
>
> Recipient shall use any Confidential Information and Materials received solely in connection with the Transaction. Recipient shall treat and handle all Confidential Information with the same standard of care used with respect to its own confidential information. Recipient agrees to disclose such Confidential Information only to (i) its officers, directors, employees and affiliates involved in the Transaction; (ii) to such agents, representatives, attorneys and advisors as have been retained by Recipient in connection with the Transaction; (iii) in response to subpoena, court order or similar legal process, or as otherwise required by applicable law or regulation. Recipient shall not remove any proprietary rights legends from Confidential Materials and shall add proprietary rights legends to any materials that disclose or embody Confidential Information. Other than as expressly granted in

---

[I]nformation disclosed by Discloser to Recipient, or its agents, employees and /or independent contractors, in any manner, that is not generally known in the industry in which Discloser is engaged, about its business and which Discloser desires be kept confidential. As to Ever-Seal Inc., Confidential Information includes, but is not limited to, operating procedures and results, customer information, information about technical, administrative, management, financial or other activities with respect to its development program, distribution networks, software programs, marketing plans and strategies, strategic alliance or joint venture arrangements, trade secrets, know-how and ideas.

(*Id*.). The Confidentiality Agreement defines Confidential Materials as:

> [A]ll physical embodiments of Confidential Information (including but not limited to specification sheets, recording media, software listings, contracts, reports, lists, manuals, quotations, proposals, correspondence or product information).

(*Id*.).

writing, Discloser does not grant any license to Recipient under any copyrights, patents, trademarks, trade secrets or other proprietary rights to use or reproduce any Confidential Materials. Neither party shall remove from the offices of the other, without written consent, books, records or documents, nor make copies of such books, records, documents or client lists for a use other than in connection with the Transaction.

(*Id*. at 1–2).

The Confidentiality Agreement also states:

The parties agree that compliance with the terms of this Agreement is necessary to protect the business and good will of each party. Further, the parties agree that a breach of this Agreement will irreparably and continually damage the other and that an award of money damages will not be adequate to remedy such harm. Therefore, the parties agree that each shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of money damages, insofar as they can be determined, including, without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement.

(*Id*. at 2).

Ever-Seal terminated Defendant's employment in November 2021. (Doc. No. 1 at ¶ 38). Ever-Seal learned in approximately December 2021 or January 2022 that prior to and following his termination, Defendant was working for a company called DuraSeal that (just like Ever-Seal) provides permanent sealing services for wood and concrete in (at least) North Carolina and South Carolina and uses the product Seal-It. (*Id*. at ¶¶ 41, 44, 45, 46).

Plaintiff contends that Defendant formed DuraSeal in June 2021 to compete with Ever-Seal by submitting bids on the same projects, marketing in the same areas, and offering the same permanent sealing services utilizing the same product, processes, and representations. (*Id*. at ¶¶ 43–54). Plaintiff alleges that "[Defendant's] conduct has damaged and is continuing to damage Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs." (Doc. No. 7 at 5; Doc. No. 1 at ¶¶ 58-65, 79-80, 92-93). According to Plaintiff, Defendant "has sourced at least 12 separate jobs

directly from Ever-Seal, and he is continuing to advertise and sell DuraSeal's competing services in at least North Carolina, South Carolina, Georgia, and Florida." (Doc. No. 7 at 6; Doc. No. 1 at ¶ 58). In the Complaint, Plaintiff asserts three counts: breach of contract, breach of fiduciary duty, and intentional interference with business relations. (Doc. No. 1 at 12–17).

Plaintiff filed the present Motion seeking entry of temporary restraining order and, following a hearing, a preliminary injunction prohibiting Defendant from engaging in conduct that competes against Ever-Seal including, specifically, a prohibition on Defendant "using, disclosing or disseminating Ever-Seal's Confidential Information and Materials," "interfering with Ever-Seal's prospective business relationships," and "offering services similar to Ever-Seal." (Doc. No. 6 at 3; Doc. No. 7-1).

## LEGAL STANDARD: TEMPORARY RESTRAINING ORDER

In determining whether to issue a TRO pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006). When determining whether to issue a TRO, a threat of an immediate, irreparable harm must be present. Fed. R. Civ. P. 65(b)(1)(A) (requiring a court to examine, on application for a TRO, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant"); *Cunningham v. First Class Vacations, Inc.*, No. 3:16-cv-2285, 2019 WL 1306214, at *1 (M.D. Tenn. Jan. 11, 2019).

Alternatively, the Sixth Circuit permits a district court, in its discretion, to grant a preliminary injunction or temporary restraining order "even where the plaintiff fails to show a

strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).

Courts sometimes describe this inquiry as a balancing test. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). And that is true, to an extent; district courts weigh the strength of the four factors against one another. The balance-of-hardships test, however, does not eliminate the irreparable harm requirement. Even the strongest showing on the other three factors cannot "eliminate the irreparable harm requirement." *Friendship Materials*, 679 F.2d at 105, cited in *Memphis A. Philip Randolph Institute v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020). That factor is indispensable. If the plaintiff isn't facing imminent and irreparable injury, there is no need to grant relief now as opposed to at the end of the lawsuit. *See Friendship Materials*, 679 F.2d at 103. That is why the Sixth Circuit has held that a district court abuses its discretion "when it grants a preliminary injunction without making specific findings of irreparable injury[.]" *Bankers Life & Cas. Co. v. McDaniel*, No. 3:21-cv-00247, 2021 WL 1165974, at *3 (M.D. Tenn. Mar. 26, 2021) (quoting *Friendship Materials*, 679 F.2d at 105). Thus, although the extent of an injury may be balanced against other factors, the existence of an irreparable injury is mandatory for a TRO to be issued. *Id.*; *D.T. v. Sumner Cty. Schools*, 942 F.3d 324, 326-27 (6th Cir. 2019).

## ANALYSIS

Plaintiff argues that its requested TRO is supported by all of the factors a court considers when determining whether to issue a TRO. (Doc. No. 7 at 7). The Court below assess each such factor in turn.

1. Likelihood of success on the merits

Plaintiff contends that it has a strong likelihood of success on the claims it asserts in the Complaint. (Doc. No. 7 at 7).

   a. *Count I: Breach of contract*

"To establish a [claim for] breach of contract, a plaintiff must show (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-CV-01022, 2019 WL 632670, at *8 (M.D. Tenn. Feb. 14, 2019). The Court finds that Plaintiff has demonstrated a strong likelihood of success on each element of a breach of contract claim.

Plaintiff has shown that Defendant entered into a contract with Plaintiff (as demonstrated by the copy of the executed contract, the Confidentiality Agreement, filed at Doc. No. 1-1). The Confidentiality Agreement, including its non-competition clause, likely is an enforceable contract under Tennessee law. *See Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28 (1984) (holding that "[a]s a general rule, restrictive covenants in employment contracts will be enforced if they are reasonable under the particular circumstances"). The non-competition clause here is reasonable in its two-year duration and limitation to just the five companies in the United States that offer and install the "Seal-It" product. While the geographic scope of the covenant is broad in that it encompasses the entire United States, Plaintiff has shown that because only five companies are implicated by the covenant, this geographic scope likely is reasonable even though wide. Without including a non-competition clause in its contracts with its employees, Plaintiff would risk losing the investment of training its employees and developing current and prospective business relationships. Without such a covenant, former employees could unfairly use the benefits

they gained while employed by Plaintiff in order to undercut Plaintiff's business for personal gain, making such a covenant reasonable under the circumstances.

The restrictions on the use and disclosure of Confidential Information and Materials contained in the Confidentiality Agreement are also likely to be enforceable. Under Tennessee law, "confidential business information is only protectible to the extent that it qualifies as a trade secret." *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F. Supp. 2d 1029, 1031 (M.D. Tenn. 1998), *aff'd*, 215 F.3d 1326 (6th Cir. 2000); *see e.g. Selox, Inc. v. Ford*, 675 S.W.2d 474, 474–75 (Tenn.1984) (finding that an agreement requiring a former employee to keep confidential all information regarding "pricing, customer lists, company policy and procedures" unenforceable because the information at issue did not constitute "trade secrets"). Tennessee courts define a trade secret to mean "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Data Processing Equip. Corp. v. Martin*, 1987 WL 30155, at *4 (Tenn. Ct. App. Dec. 30, 1987) (citing *Hickory Specialties*). Though parties regularly conflate the two, "[t]rade secrets are made up of confidential information, and confidential information will only be subject to protection to the extent it qualifies as a trade secret—in other words, that it really is confidential and not easily ascertainable, and it affords the owner a competitive advantage." *Hickory Specialties*, 26 F. Supp. 2d 1029 at 1032. For example, "even where a former employee signs a contract promising never to divulge confidential information such as customer lists and so forth, that contract is only enforceable to the extent that the information in question actually is (1) secret, (2) business related, and (3) afforded the employer a competitive advantage." *Id*.

In the Complaint, Plaintiff does not explicitly characterize the information Defendant obtained from Ever-Seal and allegedly used, disseminated, and/or disclosed during his scope of

work for DuraSeal as "trade secrets." Nor does Plaintiff make any argument in the Motion and accompanying memorandum that the information should be characterized as such (in fact, Plaintiff makes no argument that this clause is likely enforceable). Nonetheless, the Court finds that much of the information and materials (which Plaintiff deems "Confidential" pursuant to the Confidentiality Agreement) at issue here likely can be properly characterized as trade secrets. Plaintiff alleges that the Confidential Information Defendant used, disseminated, and/or disclosed includes the following: "EverSeal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary truck design and functionality." (Doc. No. 1 at ¶ 74). The Court finds that much of this information likely can be properly characterized as secret, business-related, and affording Plaintiff a competitive advantage. Thus, the Court finds that the use and disclosure restrictions prohibiting Defendant's use of Confidential Information and Confidential Materials is likely to be enforceable. Thus, Plaintiff has shown a likelihood of success as to the existence and enforceability of its contract with Defendant, including both the non-competition clause and the clause restricting the use and dissemination of Confidential Information and Materials.

Plaintiff asserts that Defendant breached the Confidentiality Agreement by working for DuraSeal—a company that provides the same products and services as Ever-Seal in the same

region in which Ever-Seal operates—and by using "Confidential Information and Materials" to directly compete (under the moniker of DuraSeal) against Ever-Seal.³ (Doc. No. 7 at 12). Such facts, accepted as true for purposes of this Motion, establish a likely breach of the terms of the Confidentiality Agreement. Plaintiff is thus very likely to succeed on this element.

Plaintiff has demonstrated likely damages to Ever-Seal "in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs" and has supported the existence of such losses with its verified Complaint. (Doc. No. 7 at 12). The Court thus finds that Plaintiff is likely to succeed in establishing this final element of its breach of contract claim.

Because the Court finds that Plaintiff will likely succeed in establishing each of these elements, Plaintiff has a strong likelihood of success on its breach of contract claim.

  b. *Count II: Breach of fiduciary duty*

Plaintiff states: "In addition to asserting claims for breach of contract and intentional interference, Ever-Seal also brings a claim for breach of fiduciary duty. Although Ever-Seal is confident it will prevail on all claims at trial, the focus of this motion is on the breach of contract and intentional interference claims." (Doc. No. 7 at 1). Plaintiff thus does not present any argument as to why and whether it has a strong likelihood of success on its breach of fiduciary duty claim. The Court likewise will not address this claim, and so doing is unnecessary in any event because the Court finds that Plaintiff has established a strong likelihood of success on its other two claims.

---

³ One can quibble over whether he also breached the Confidentiality agreement by disclosing the Confidential Information and Materials to a competitor (DuraSeal), since any such disclosure arguably is essentially a "disclosure" to himself, which arguably means it is not a disclosure at all. But in any event, Plaintiff has shown a strong likelihood that he "used" the Confidential Information and Materials in violation of the Confidentiality Agreement.

### c. Count III: Intentional interference with business relations

In order to establish intentional (tortious) interference with business relationships under Tennessee law, a plaintiff must prove the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, No. 3:17-cv-01095, 2020 WL 5797974, at *6 (M.D. Tenn. Sept. 29, 2020) (citing *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)). Significantly, the claim can be based on either an existing business relationship or a prospective business relationship. *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at *6 (M.D. Tenn. Apr. 2, 2020). The Court finds that Plaintiff has demonstrated a strong likelihood of success on each element of a claim for intentional interference with business relations.

Plaintiff argues that Ever-Seal has prospective business relationships with an identifiable class of third persons: "individuals and businesses in need of permanent wood and concrete sealing services." (Doc. No. 7 at 13). *See, e.g., Yoe v. Crescent Sock Co.*, No. 1:15-CV-3- SKL, 2015 WL 13847410, at (E.D. Tenn. Dec. 11, 2015) (explaining plaintiff need only identify "a class of third persons" for prospective business relationships and finding allegations sufficient where plaintiff alleged defendant interfered with prospective classes of customers including outdoor retailers); *PPG Indus., Inc. v. Payne*, No. 3:10-CV-73, 2012 WL 1836314, at *4 (E.D. Tenn. May 21, 2012) (sufficient where counterclaim plaintiff identified prospective business relationship as potential paint-buying customers). Plaintiff is thus likely to succeed in establishing this element.

Plaintiff has further established that, as a former estimator and sales manager at Ever-Seal, Defendant possessed knowledge of Plaintiff's prospective business relationships. As an Ever-Seal employee, Defendant was directly responsible for communicating with prospective customers and was directly involved in the company's sales. (Doc. No. 1 at ¶¶ 19-21, 25-28, 36, 89). Thus, the Court find that Plaintiff is likely to succeed in showing that Defendant possessed knowledge of Plaintiff's prospective business relationships.

Plaintiff states that "Halferty has intended to cause a breach or termination of Ever-Seal's prospective business relationships by sabotaging sales on behalf of Ever-Seal, poaching and soliciting Ever-Seal's potential customers he learned of through his work for Ever-Seal and directing them to his separate competing company, using Ever-Seal's confidential and inside information to divert business to his separate competing company, and otherwise inducing potential customers to use DuraSeal's services rather than Ever-Seal's services. Ver. Compl. ¶¶ 41-57, 90-91; Ex. A, Lucero Decl., at ¶¶ 2-19." (Doc. No. 7 at 14). Thus, Plaintiff has shown that Defendant likely intended to cause the breach; the Court finds that Plaintiff has a strong likelihood of success on this element.

The Court finds that Plaintiff is also likely to succeed in showing that Defendant used improper means to interfere with Ever-Seal's prospective business relationships by "engaging in misrepresentations and deceit, misuse of inside or confidential information, unfair competition, breach of his contractual duties to Ever-Seal (including his non-compete clause and confidentiality clause), and breach of his fiduciary duties to Ever-Seal." (Doc. No. 7 at 14–15 (citing Ver. Compl. ¶¶ 41-57, 66-86, 91; Ex. A, Lucero Decl., at ¶¶ 2-19)). In *Trau-Med*, the Tennessee Supreme Court embraced a broad view of what can constitute improper motive and improper means. *Kolstad v. Leehar Distributors, LLC*, No. 3:18-cv-00060, 2018 WL 6832086, at *7 (M.D. Tenn. Dec. 28,

2018). Either improper motive or improper means will suffice. *Watson's Carpet and Floor Coverings, Inc. v. McCormick,* 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007). The Court finds that Plaintiff's verified factual allegations of existing and prospective business relationships, Defendant's knowledge of those relationships, and Defendant's use of Ever-Seal's confidential information and direct competition with Plaintiff's prospective customers (in direct violation of the non-competition clause) show that Defendant likely acted with an improper motive and/or improper means with the specific intent to interfere with Plaintiff's business relationships.

Finally, Plaintiff has shown a strong likelihood of success in establishing damages resulting from Defendant's tortious interference. These likely damages include the loss of business, customer relationships, goodwill, profits, and administrative, marketing, recruiting, and training costs. (Doc. No. 1 at ¶¶ 58-65, 92-93).

Because the Court finds that Plaintiff will likely succeed in establishing each of these elements, Plaintiff has a strong likelihood of success on its intentional interference with business relations claim.

2. <u>Whether the plaintiff will suffer irreparable injury without the injunction</u>

Plaintiff argues that it will likely suffer "immediate and irreparable injury" without an injunction because Defendant will otherwise continue to commit "further breaches and further intentional interference." (Doc. No. 7 at 15). Plaintiff also notes that in the Confidentiality Agreement, Defendant expressly consented to the terms that "compliance with the terms of this Agreement is necessary to protect the business and good will of each party," "breach of this Agreement will irreparably and continually damage the other and that an award of money damages will not be adequate to remedy such harm," and that Ever-Seal "shall be entitled to both a

preliminary and/or permanent injunction in order to prevent the continuation of such harm." (Doc. No. 1-1 at ¶ 8).

The Sixth Circuit has found that the breach of a non-competition clause typically is likely to cause irreparable harm to an employer. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. [ ] Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), and *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991) (holding that irreparable harm can be inferred from insurance sales representatives' breach of non-competition covenant))).

Plaintiff has shown that if Defendant is not enjoined from continuing to breach the non-competition clause, Plaintiff is likely to continue suffering from irreparable injury "in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs." (Doc. No. 7 at 12). The Court finds that this likelihood of Plaintiff suffering from irreparable harm absent the issuance of an injunction to be adequately supported by the verified Complaint and the declaration accompanying the Motion. This factor, and indeed requirement, thus weighs strongly in favor of granting the Motion.

3. <u>Whether granting the injunction will cause substantial harm to others</u>

Plaintiff asserts: "no harm to others would result from an injunction enforcing the terms of the parties' Confidentiality Agreement and prohibiting Halferty's intentional and tortious interference. The only third parties potentially affected by the injunction are prospective customers in need of permanent wood and concrete sealing services. Those prospective customers can still

obtain permanent wood and concrete sealing services from Ever-Seal or other companies providing similar services." (Doc. No. 7 at 16–17). Further, Plaintiff states that any possible harm to Defendant resulting from an injunction is "not the kind of harm that weights in his favor; such harm is not created by the injunction but rather harm that [Defendant] brought upon himself when he agreed not to operate a competing business." (*Id.*).

Given Plaintiff's likelihood of success on the merits and the tailored scope of the TRO that will be issued, an injunction would enjoin Defendant from doing things he should not be doing anyway (that is, breaching his contract with Plaintiff). On the other hand, Plaintiff has shown that it is likely to be substantially harmed by the short-term continuation of such activities, because even Defendant's short-term engagement in poaching Plaintiff's customers and breaching the non-competition agreement will result in Plaintiff's lost business, customer relationships, profits, and so on. Thus, the Court agrees that the balance of harms weighs in favor of granting injunctive relief (to at least some extent) in the form of an appropriately tailored TRO.

4. <u>The injunction's impact on the public interest</u>

Plaintiff argues that "[n]o important public policies are implicated by the issuance of the requested injunctive relief in this case other than the general public interest in the enforcement of voluntarily assumed contract obligations." (Doc. No. 7 at 17). The Court agrees. To begin with, this is at heart a private dispute, and the public has no particular stake in the outcome, *i.e.*, who wins and loses. The public does have an interest in certain imperatives implicated by the dispute, however, such as the sanctity of contracts and the protection of a business' right to enforce non-competition clauses to protect sensitive proprietary information and maintain customer relationships. Given Plaintiff's likelihood of success on the merits of claims that would vindicate these interests, the public interest weighs in favor of granting the Motion.

## CONCLUSION

For all these reasons, Plaintiff's Motion for Temporary Restraining Order will be granted via a separate Temporary Restraining Order wherein the Court order will order the following relief (consistent with Plaintiff's proposed TRO at Doc. No. 7-1, which the Court finds to be appropriately tailored in scope), subject to the posting of a bond as discussed below:

1) That Defendant and all agents, servants, employees, officers, attorneys, successors, licensees, partners, assigns, vendors and all persons acting in concert or participation with him and each other immediately:

    a) Take affirmative steps to preserve all records related to their misconduct alleged in the Complaint through the pendency of this lawsuit, including all records documenting their customers and potential customers, sales, leads, inquiries, marketing efforts, business plans, revenues, profits, processes, employees, and communications with/about any of the above and/or Ever-Seal;

    b) Cease engaging in conduct that competes against Ever-Seal, Inc. without limiting the foregoing, Defendant is explicitly prohibited from:

    i) Using, disclosing or disseminating Ever-Seal's Confidential Information and Materials;

    ii) Interfering with Ever-Seal's prospective business relationships;

    iii) Offering services similar to Ever-Seal.

As required by Fed. R. Civ. P. 65(b)(2), the Court finds that Plaintiff has established the notice requirements for *ex parte* issuance of a temporary restraining order.[4] The Court further finds

---

[4] Plaintiff's counsel writes the following, and the Court agrees:

*ex parte* issuance appropriate under the present circumstances given the indication of the likelihood of irreparable harm ongoing day by day and the fact that the record in no way suggests that Defendant has retained counsel in this matter who could be provided prompt notice in order to respond to the Motion.

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, "the rule in [the Sixth Circuit] has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. EaglePicher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present. *Id*. at 1176. Under the circumstances of this case, the Court finds that the inevitability of harm to Defendant in the event the TRO proves to have been improvidently granted, the likely approximate amount of damages from such harm, the countervailing strength of Plaintiff's case, and the public interest favor the requirement that Plaintiff post a security bond in the amount of $10,000.00.

---

Issuance of the requested relief is warranted even without notice to Defendant because the specific facts presented in the Verified Complaint and Declaration of Tim Lucero clearly show that immediate and irreparable injury, loss, or damage will result to Ever-Seal before Defendant can be heard in opposition. Any harm to Defendant resulting from issuance of a temporary restraining order without prior notice is minimal and alleviated by the short-term nature of such relief, the security required under Fed. R. Civ. P. 65(c), and the opportunity to move to dissolve the order as stated in Fed. R. Civ. P. 65(b)(4).

(Doc. No. 6 at 2).

The Court therefore will require Plaintiff to post security in the amount of ten thousand dollars ($10,000.00), in a form satisfactory to the Clerk of Court. Upon notification of the posting of such security, the Court intends to issue immediately a TRO as described, and for the reasons, discussed herein.

A hearing to consider Plaintiff's Motion for Preliminary Injunction will be set for **February 22, 2022 at 1:00 p.m.** Absent extraordinary circumstances, the hearing will conclude on that day.

The parties shall file with the Court no later than 48 hours prior to such hearing the following pertaining to such hearing: (1) any affidavits; (2) witness lists; (3) exhibit lists; (4) any depositions and/or deposition designations; (5) any stipulations; (6) any motions in limine; and (7) any supplemental briefs. No witness shall testify live at the preliminary injunction hearing unless the party calling such witness to testify has identified and made that witness available for a deposition prior to the hearing.

Although the Court has opined herein that Plaintiff is likely to succeed on the merits, it realizes that this view is merely preliminary and based on the current record and that Plaintiff may or may not ultimately succeed on the merits.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE